Good morning. David Schechter on behalf of plaintiff and appellant Anthony DeFrancesco. I'd like to reserve three minutes, please. Mr. DeFrancesco is an award-winning dietitian with over 15 years experience in administration of public health organizations. In 2015, the university hired him to fill a senior position in the finance department of the University of Arizona Health Sciences. This was a dream opportunity. He is an alumni of the university. His father, his uncle, and his two younger brothers graduated from the university. His grandfather taught at the university. When he took this position, he thought this would be a place where he could finish his career. Over the next two years, he was asked to take on more responsibility when more senior people left, which he agreed to do. He worked nights and weekends. He received positive reviews, no negative employment complaints, raises and bonuses each year. By 2017, he was one of the most senior officials in the finance department of the University of Arizona Health Sciences. But when Dr. Michael Dake took over as head of the department, Mr. DeFrancesco was harassed, humiliated, and ultimately fired. He was never given a reason why. He was never given an explanation. To this day, we do not know why. We have alleged that he was passed over and fired for two reasons. One, sexual orientation discrimination. Two, First Amendment retaliation. Both theories were dismissed. We submit that this was error. I'd like to first address sexual orientation discrimination. This theory alleged under Title VII and the Equal Protection Clause of the 14th Amendment, for pleading's purposes, the standards are the same. Did the plaintiff allege intentional discrimination as a motivating factor in adverse action? Under this court's precedence, it's not a high bar to plead that claim. I direct the court's attention to Shepard v. David Evans. When you have a straightforward discrimination theory, not much is required. Plaintiff needs to allege he's a member of a protected class, which Mr. DeFrancesco alleged, that he was qualified for his position, which he alleged, that he suffered adverse action, which he alleged, and that persons outside of his class received favorable treatment, again, which he alleged. You don't have to allege any animus for sexual orientation? Under this court's precedence, the pleading burden is just to allege what I have just described. I thought that's the McDonald's test, what you're describing. So what needs to be alleged is a plausible claim of discrimination. So animus intent is part of a claim, so the court needs to be satisfied that we've alleged a plausible claim. Under this court's precedent and others, this is also a Swanson from the Seventh Circuit, when you have a straightforward case of discrimination, you don't need to allege much more than what I just described. Well, that's the problem. What's straightforward about this? I haven't seen any allegation that Robbins or Dackey had any animus on sexual orientation grounds. So we have alleged the October 2018 meeting. So shortly after Dr. Dake takes the position as head of the department, there's a meeting between Mr. DeFrancesco and Dr. Dake. This is a one-on-one meeting, Mr. DeFrancesco with his new boss. At the meeting, Mr. DeFrancesco asks, you know, hey, can I receive a formal title because I've been doing this work and I'd like a pay increase? I'm working basically two to three jobs. At that meeting, Dr. Dake says, now that your husband has left the university, you have a decision to make. When your boss tells you that, that's basically telling you you need to start looking for other work. So with that statement, he is referencing my client's sexual orientation in a manner that deals with his continued stature at the university. How does that reference animus, though? It's a simple fact, he's married. So a couple points. One, intent can be alleged generally. Two, there are cases in this court in the 21st century, rarely do you have direct evidence where someone reveals their biases directly to you. This would be a much simpler case if somebody used a slur or if that was referenced, obviously. But this is a pleadings case, and so the question is just, is there enough here to allow the case to move forward? And we submit under this court's precedence, there are. Also, if we are to engage in the McDonnell-Douglas test, which is a way to see if there is circumstantial evidence of animus, we look to whether someone who is similarly situated to Mr. DeFrancesco received favorable treatment, which we've alleged. So Mr. DeFrancesco was passed over and ultimately fired, given no explanation, no legitimate reason. And he was replaced by somebody who is heterosexual and who is not more qualified than Mr. DeFrancesco. And another point which I think is significant is that in the meeting between Mr. DeFrancesco and Dr. Dake, Dr. Dake said, I'm looking for someone who's more strategic, a broader thinker. And then he fires Mr. DeFrancesco and hires a university bureaucrat. That doesn't make sense. So when you add it all up, we submit that more than enough has been alleged here to allege a plausible claim for sexual orientation discrimination. If there's no other questions, I can move on to the First Amendment. If he was married to a woman and he says, now that your wife is gone, you need to think hard about what you're going to do. You wouldn't say that that's heterosexual discrimination, would you? I think just that there has not been a lengthy history of discrimination towards heterosexual people who are married. So I would say that's a difference. And I would point this court's attention to the Supreme Court's recent decision in Bostock, where there were three plaintiffs who were, for purposes of that case, it was conceded, were fired because they were, because of their sexual orientation discrimination, because of their sexual orientation. It does happen in the 21st century, which is unfortunate. I just don't know if we fled that. And I understand, and I understand your Honor's pushback. I just would submit that if you needed direct evidence of animus at this stage, many meritorious discrimination cases would never get off the ground. As to the First Amendment, if there's no other questions, I'll move to the First Amendment. So the First Amendment claim is based on the speech of Mr. DeFrancesco's husband, Mr. Goldman, who at the time was the chief financial officer of the university. So how do you see he was speaking as a private citizen when he went to Robbins and said, I'm reporting. In fact, your complaint talks about him reporting to Robbins about this search. Yes. There's a key distinction. So Mr. Goldman was serving as co-chair of the committee, and part of his job in that role was to obviously organize and keep it moving forward, but also to report what was happening. We can see that. However, it was not his job to report on the ethics and honest practices in setting up and running the search committee, whether there were outside influences on the committee. In other words, he was not internal affairs or an ethics committee evaluating whether President Robbins had exerted undue influence on the committee. So in that sense, when he was reporting not just the lack of qualifications of Dr. Date, but also on the fact that President Robbins had created a sham system, he was speaking as a private citizen. Essentially, during the process. Who did he say that that was occurring, that it was a sham system? Yes. So throughout the process, Mr. Goldman started to realize what was happening. There were several meetings and several rounds of interviews. Ultimately, there was a major meeting near the end of the process. President Robbins was in the room. President Robbins, chief of staff, the provost of the university, the senior most legal official was in the room and others. Basically, the most senior meeting you can get, apart from being with the Board of Regents. And at that meeting is when he explained what he had found. Not just the lack of qualifications, but the fact that there was undue influence and that this process was being rigged. And he then advocated, this cannot, this has to stop. Is that in the complaint? It's not in the complaint, Your Honor. We were never given leave to amend. So the first time we learned that the district court judge found that we had deficiencies in that claim, which we don't submit that we did. But the first time we learned of that was in the judge's order dismissing the claim with prejudice. So is it fair to say if you were given an opportunity to amend that that would be included? Absolutely. What else would be included on the First Amendment claim? Just to make it clear what I've just described, that the speech is not just reporting qualifications of Dr. Dake. It's the fact that Mr. Goldman was effectively acting as a whistleblower based on what he had found during this process. Thank you. But I thought you were saying his statements were based off as a private citizen. Correct. So the analysis in that sense is what were his official duties? So he was the CFO of the university, but that's not really relevant for this. He was a co-chair of the search committee. So the question is what were his duties as co-chair of the search committee? His duties as co-chair of the search committee were not to evaluate President Robbins and whether President Robbins was exerting undue influence on the process, if that makes sense. So I can analogize it to, let's say you have a police officer whose job it is to investigate crimes. If he then sees something of another police officer doing something wrong, unless he's in internal affairs or that's part of a police officer's job, that's not necessarily within that police officer's duty. So your theory is it's retaliation for Goldman speaking out against Robbins and that Daki retaliated against speaking out against Robbins? I thought it was, as I read the complaint, it was it's retaliation against speaking out against Daki saying that he's not qualified. That makes much more sense. Yeah. I believe it's pronounced Dake. Oh, sorry. That's okay. Dake? Dake, yeah. So what's alleged in the complaint, to the extent there's any issue we could amend to clarify, President Robbins apparently had already offered the job to his best and longest and dearest friend, Dr. Dake, before the process began. So the two of them were working together in this. So the retaliation that we allege is not just, again, that Dr. Dake was unqualified, but that President Robbins had exerted undue influence so that Dr. Dake could get the job. Essentially, Mr. Goldman found out what was happening and brought this to light in an effort to try and stop it. Animus developed. This is on the pleadings. We do not have the evidentiary record. Animus developed. And by the time Dr. Dake had taken his position, Mr. Goldman had already left for UCLA. So the only person left was Mr. DeFrancesco. So, Counsel, if I understand your theory, your client was being retaliated against because of his husband having engaged in First Amendment speech. That's correct. First Amendment speech. Is there a case on that? Do you have a case where that's asserted as a valid claim? Yes, Your Honor. We've cited 16 cases on pages 37 and 38 of our brief, including footnote six. We do concede that there is no controlling decision from this court, but there are decisions from the Second Circuit, from the Sixth Circuit, and from numerous district courts, both within this circuit and outside the circuit. Do you want to reserve some time? Yes, unless there are further questions. Thank you. Good morning, Your Honors. And may it please the Court, Dan Dowd and my colleague, Rebecca Van Dorn, on behalf of the Appellees, the Arizona Board of Regents, University of Arizona President Robert Robbins, and Senior Vice President Michael Dake. Your Honors, the district court correctly ruled, first, that the First Amendment retaliation claim failed because the speech complained about, the speech of Mr. Goldman, was not protected. And secondly, even if it was, the claim would be barred by qualified immunity. Second, the district court. Counsel, I have a question about that. Okay, let's assume it's barred by qualified immunity. We're at the pleading stage. I don't think, qualified immunity is a defense. And we're not at the point where we would be talking about borrowing a claim. And it seems to me that even this discussion and this argument flows into the district court's misunderstanding of the proper standard to be applied at the motion to dismiss case. Because you don't apply McDonald-Douglas at the motion to dismiss case stage. You look at the complaint and see if something's plausibly alleged. So wouldn't you have to, you haven't filed an answer yet, right? Correct. Wouldn't you have to file an answer, assert qualified immunity as a defense, and then bring your own motion for partial summary judgment on that defense to assert qualified immunity? No, Your Honor, I don't think we need to. Qualified immunity is an immunity from suit, not an affirmative defense. And if the facts as pled don't show a clearly established right, then qualified immunity is appropriate at the motion to dismiss stage. There are cases, unreported decisions from district courts and this circuit from around the country that have ruled on this issue at the motion to dismiss stage based on the quality or lack of quality of the complaint and asserting a right that is clearly established. Maybe they haven't failed to state a claim, but I don't see that we rule on qualified immunity at the complaint stage. Well, we've identified in our papers courts within this circuit that have, and we haven't run into any authorities saying that it is per se improper to do it at the 12B6 stage. Is there a Ninth Circuit case on that? Can you give me the Ninth Circuit case on that? There are no reported decisions from the Ninth Circuit. There are cases from district courts within the Ninth Circuit. We're not bound by the district court decisions within the Ninth Circuit. Understood, Your Honor. I was trying to respond to your question as to whether this is the appropriate procedural juncture for a qualified immunity argument. And we submit that it is. If the right's not clearly established, the litigants shouldn't have to go through the expense of discovery to argue on summary judgment, that which they can argue based on the four corners of the complaint. So in this case, and let me go back to another comment, Your Honor, about whether the district court applied the right standard or not. The district court didn't apply McDonnell Douglas, although even if it did, that doesn't stop the presses and cause reversal. What happens here is the plaintiff has to allege a claim that's plausible. And a claim that's plausible if it alleges sufficient factual content that allows the reasonable inference that the defendant is liable for the misconduct that is alleged. What the plaintiff argued in his papers, I don't think he had time to argue it today, was that Judge Jorgensen, by applying McDonnell Douglas, somehow broke the mold and she did something improper. And that because McDonnell Douglas is an evidentiary standard, we can't look at it in deciding whether or not a claim is adequately pled. That's just incorrect. There is inherent overlap between what's plausible and what satisfies a prima facie case. A plaintiff doesn't have to come forward with evidence in the complaint showing that he or she is going to prevail on the merits, but they have to plead factual content that allows the district court to decide, yes, there's a reasonable inference that the defendant engaged in this misconduct. And you have to plead all the essential elements. If this was a contract case and I didn't plead acceptance, I'd be thrown out. That's an essential element of the case. If it was a securities fraud case and I didn't prove scienter. And so I agree with you that you have to plead all the elements of the claim in order to state a claim. That's clear. But you don't have to plead, for example, that the state's proper legitimate reason was actually pretext. I agree with you, Your Honor. But you do have to plead facts that will allow a court to draw an inference in your favor on every element of the claim. Every element of the claim. And if I pled a claim that just didn't exist, but I pled a lot of facts supporting it, but the claim wasn't cognizable, there are case after case after case saying I get thrown out. So the same should be for qualified immunity. If someone comes in here and alleges a right that is not clearly established, the whole purpose for 12b-6 is to dispose of cases before the machinery of discovery and summary judgment occurs if the facts plead the plaintiff out of court. And I know I'm jumping back and forth between the discrimination and the qualified immunity, so let me go back to the employment discrimination claims. The fact that Judge Jorgensen cited language that's also cited in McDonnell Douglas doesn't mean that she improperly applied McDonnell Douglas. The judge was determining whether there was a plausible claim, a reasonable inference, that the defendants had engaged in the conduct about which they are charged. And to do that, you have to look at the elements. And one of the elements, the fourth element, the element that my colleague referenced was they have to plead facts that would allow a reasonable inference that either comparators, someone similarly situated but outside the protected class was treated more favorably, or in the words of all of the courts, other circumstances around the adverse personnel action that permits an inference of discriminatory intent. They've tried both here, so let's take a look at each one. On the comparator, we have three allegations in the complaint trying to establish that others outside the protected class but similarly situated were treated more favorably. Here are the three allegations, and this is it. After Judge Jorgensen said, hey, go back and try a little harder, this is what they came up with. One, that heterosexual males at the same level of seniority as Mr. DeFrancesco in UAHS, the department that the complaint says has over 500 employees, were permitted to keep their jobs. Secondly, that the university hired a heterosexual male, David Elmer, as the associate VP for finance and administration, a job plaintiff never held. It's a job he wanted, but he never held. And lastly, that Mr. Elmer was a 15-year employee who had, quote, bounced around department to department. That's it on comparators. What don't we have? We don't have any information about the actual positions of the heterosexual males who kept their jobs, nothing about their experience, nothing about who they reported to, nothing showing a connection to the actor, in this case, Dr. Dake, nothing showing about the conduct that they engaged in. Did they repeatedly ask for raises? And you can tell from the complaint that this plaintiff asked for raises from those that preceded Dr. Dake and didn't get them either. But we don't have any of that information. We don't have any information or any level of specificity that would allow a court to say, yeah, there's a reasonable inference that these folks are similarly situated either in position or in conduct from which we can draw an inference that there could have been a discriminatory animus here. There's nothing, nothing. So when you get by the comparator evidence, we then go to what other evidence of discrimination has been offered in this complaint. And that's found in two paragraphs, two remarkable paragraphs of this complaint. The first is paragraph 26 that says, Dr. Dake is a surgeon. He's a heterosexual male surgeon. Ergo, he's part of a jock frat culture. In paragraph 27, because he's a surgeon, he's in a jock frat culture. And those people only hire male, heterosexual masculine males for finance jobs. It's one plus one equals seven. It doesn't make any sense. And as Judge Jorgensen said, that's a conclusory allegation and it's an unreasonable inference. We are not going to infer an essential element of this claim, intent to discriminate based on sexual orientation, because the actor is a surgeon. That's saying that by membership in a group, by membership in a group, you somehow have adopted the alleged mantra of that group that you're going to discriminate in finance jobs only in favor of masculine heterosexual males. And the court said those kinds of allegations are not entitled to a presumption of truth under the 12B6 standard because they're conclusory and they are unreasonable inferences. You can't infer from membership in a group. Remember, there's no allegation of what Dr. Dake's beliefs are. There's no allegation that because he's a surgeon, he ascribes to the jock frat. Well, they say he's in the jock frat culture, but there's no facts alleged that would support that and nothing talking about his actual conduct being consistent with that of this jock frat culture. So, on the discrimination claims, after being given a roadmap by Judge Jorgensen as to what you need to prove, your missing intent, bring me allegations of intent, all we have are heterosexual males in unknown departments, with unknown jobs, with unknown supervisors, kept their jobs, and David Elmer, who had 10 more years experience at this university than this plaintiff, received a job that this plaintiff never had. That's it. You cannot infer an intent to discriminate based on sexual orientation because of that. Can you move on to the First Amendment claim? Absolutely. I'll start with whether the speech is protected. Because if the speech is not protected, the whole claim collapses and we don't even get to qualified immunity. So, it's been a little bit unusual to figure out exactly what the claim being asserted is. In some pleadings and at the district court, it was, this is a First Amendment free speech retaliation claim. In the paragraphs of his complaint, paragraph 65 and 66, it's a First Amendment right of association claim, dependent on the speech of his spouse, Mr. Goldman. Then at oral argument, he pivoted and said, no, it's not an intimate association claim. It's a free speech claim. Judge Jorgensen disagreed, said, hey, look, your only connection to the speaker is your intimate association with him as a spouse. So, I'm going to find that they're intertwined. Regardless of how you look at them, both claims are barred. And that's because Mr. Goldman's speech was not protected. I have to speak as a private citizen on a matter of public concern. With much of the argument I heard, I've never seen before, it's not anywhere in the complaint. So, I'll set that aside. Let's look at what they alleged in the complaint. I was curious. Today, I hear that it's a whistleblower. The speech was a whistleblower speech. Is that protected by the First Amendment? For the speaker, yes. We haven't analyzed, because it's never been pled, whether someone with an association to the speaker has whistleblower protection. I think under Title VII, that authority exists. But Title VII authority doesn't morph over to show whether a constitutional right exists or not. As I now understand it is that Goldman complained about the process against and is blowing the whistle against Robbins. And that Dake retaliated against that by firing his husband. I heard that today, too. So, is that a viable First Amendment? Well, it wouldn't be because, well, one, there's no resemblance to the facts in this case. And let me just point that out because that's really important because we're here on the facts of this case. Here's what the complaint alleges about the speech of Mr. Goldman as we analyze whether it's on a matter of public concern. Paragraphs 33, 37, and 39 of the complaint say, one, Goldman reported to Robbins that Dake did poorly in the initial interview and likely wouldn't be advanced by the committee. Goldman said later hiring Dake would be a mistake, President Robbins. And third, Goldman said, President Robbins, this could be such a big mistake that it could cost you your presidency. That's it. Not another allegation, no allegation of abuse. Let me take the words from their briefs on appeal. No allegations of abuse, sabotage of candidates, systematic rigging of the hiring process. None of that's in there. And we know from de Rochers we're going to evaluate whether the speech is protected based on what you actually said, not counsel's post hoc rationalations about what they think you said. So if we look at what they actually said, there's no way. What's your response to that they should be given another chance to amend? Well, the nature of the facts alleged by my colleague during his opening argument are remarkable because in a case when you're alleging protected speech by a government official to omit the type of factual content that he said for the first time, we didn't hear this anywhere else, not down below, not in any piece of paper, is remarkable in a case where you have to show that the speech is protected. Based on what he said, I think you still have to look at if the speech owes its existence to Mr. Goldman's fulfillment of his professional obligations, that speech is not on a matter, or excuse me, he's speaking not as a private citizen but as a public official. And we know from the case law that if the speech is confined, here the only allegation is that he talked to Robbins. He didn't post it on the Internet, it wasn't on Facebook, it wasn't anything that was reported to the public. That's not dispositive, but it does cut against the analysis of whether he's speaking on a matter of public concern. And also we know that the content of what he said derived completely from his service as chair of the search committee. That's it. In all of the cases, the speech permeates beyond reporting to the person that you are obligated to report to in the chain of command, reporting on your duties to vet the candidates and give your opinions. That's not a matter, that's not speaking as a private citizen. And internal hiring decisions, it wasn't even a hiring decision, it was his opinion about a hiring decision that should be made. It's not a matter of public concern, DeRochers is pretty clear on that. I see that I have worn out my welcome and we would ask that the district court's decisions be affirmed. Thank you. Thank you, counsel. Thank you, and I'll be brief, although there's a lot I could cover. But just on the sexual orientation discrimination, it just evidences why in these cases you don't require so much to be alleged up front because you can't, there's been no discovery. Don't know the qualifications of the other people who've been hired. I don't know who else has been fired. Neither does my client. That's why we need discovery. As to the First Amendment, we did argue that this was the theory. We did ask for leave to amend, but we told the court that we could amend to add these allegations in the complaint. We didn't, we were never given the opportunity, which is why the complaint is what it is. It's the first complaint, there wasn't leave to amend on this claim. I'm sorry, did you say that you identified this particular meeting with the regents and everyone to the trial judge? No, the court asked me at oral argument, do you have other facts? Just generally, we did not have anything from the court to say which deficiencies the court viewed were in the complaint. We said we did not put all the facts in this complaint that would be a 50 page complaint. We've just put the general outlines and we asked for leave to amend to cure any deficiency. Thank you. I direct this court's attention also to the en banc decision in Dahlia. When there is a dispute over the officer's duties, which there is here, you heard from my colleague that Mr. Goldman's speech was part of his role as co-chair of the search committee. Mr. Goldman disagrees with that. We have, we can produce evidence to say that that's not correct. When there is a dispute, the court reserves judgment until the fact-finding process is complete. We submit that the First Amendment retaliation claim can't be decided in the defense's favor on the pleadings, especially without leave to amend. The proper course is to reverse the court's decision below, remand for further proceedings, and allow the parties to conduct discovery to develop an evidentiary record. Any other questions? Thank you. Thank you. This case is submitted.
judges: WARDLAW, BUMATAY, Gleason